[S. F. No. 14755. In Bank.—January 31, 1933.]

IRENE MARSH et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION, SPICKY POLISH CORPORATION (a Corporation), et al., Respondents.

Winston C. Black for Petitioners.

A. I. Townsend and Harry G. Sanford for Respondents.

PRESTON, J.—In these causes a single writ of review was issued by the District Court of Appeal, First District, Division One. The regular justices of this division, Mr. Justice Knight and Mr. Justice Cashin, sitting with Mr. Justice *pro tem.* Johnson, gave the causes most careful consideration which included extended original research. The justices reached a tentative conclusion as to the proper rule of law to be declared in such cases and to that end Mr. Justice *pro tem.* Johnson prepared an exhaustive opinion wherein he promulgated this rule. The justices then found that their conclusions were at variance with

other opinions of the District Court of Appeal in similar cases, to wit: *Kauffman* v. *Industrial Acc. Com.*, 37 Cal. App. 500 [174 Pac. 690], *Blanchard* v. *Industrial Acc. Com.*, 68 Cal. App. 65 [228 Pac. 359], and *Associated Indemnity Corp.* v. *Industrial Acc. Com.*, 124 Cal. App. 378 [12 Pac. (2d) 1075]. It is also to be noted that the cited cases are not altogether in harmony with each other. Therefore, for reasons of public policy and at the request of said justices, the above causes were transferred to this court for determination. After due consideration thereof, we have adopted the rule of law declared in the above-mentioned tentative opinion and by so doing we have modified the doctrine of the cited cases so far as it is out of harmony with this pronouncement. We are pleased to adopt practically the entire opinion prepared by Mr. Justice *pro tem.* Johnson as the foundation for our conclusion herein. It is as follows:

"The petitioners in this proceeding presented to the Industrial Accident Commission their several applications for compensation benefits under the Workmen's Compensation Act; and the applications having all been denied after due hearings, wherein there arose questions of law and of fact common to all parties, the petitioners joined in applying to this court for a review of the orders by which they deem themselves aggrieved. The petitioners Irene Marsh and Myrtle Woods are applicants for death benefits by reason of the deaths of their respective husbands, Daniel Birch Marsh and Jack C. Woods, while the petitioner Harry Lange applied for disability compensation in his own behalf.

"Marsh, Lange and Woods had all been employed by the Spicky Polish Corporation, whose insurance carrier was the State Compensation Insurance Fund. The Spicky Polish Corporation is engaged in business in San Francisco in the manufacture of a silica powder used for cleaning and polishing purposes. From the evidence it appears that, by reason of conditions incident to their employment, the three men named became affected with an occupational disease, such as is frequently contracted by miners working in tunnels, and which is medically known as pneumonoconiosis silicosis, or more simply as pneumoconiosis silicosis, a term denoting a disease of the lungs due to silica dust, and sometimes called merely silicosis. Marsh worked in the plant from

December 13, 1926, to February 13, 1928, and died on February 14, 1930. In the case of Lange there was an interruption in his employment, his service which began on February 11, 1927, having continued to November 15, 1927, and then after an interval having been resumed from April 1, 1928, to June 8, 1928. Woods was employed from June, 1928, to August 3, 1929, and died on August 10, 1929. The applications of all three applicants were filed on October 20, 1930.

"The orders denying compensation and death benefits were based upon the ground that each of the applications was barred by lapse of time under the provisions of the Workmen's Compensation Act; and it is for the determination of this question that the writ of review was issued in this proceeding.

"An occupational disease is classed not as an accident, but as an injury; and under section 11 of the act proceedings in such cases for collection of disability payments must be begun within six months from the date of the injury; and for collection of death benefits within one year from the date of death, subject to the exception, among others, that the right to such benefits is barred unless death ensued within one year from the date of the injury. As will be seen later, this exception becomes pertinent in the Marsh case, Marsh having died on February 14, 1930, and the proceeding by the widow having been instituted on October 20, 1930, and hence earlier than one year after the death. As is said in *Textileather Corp.* v. *Great American Ind. Co.*, 108 N. J. L. 121 [156 Atl. 840]: 'It is a well-known fact that industrial diseases are gradual in development—the first and early steps are not always perceptible. The rate of progress may vary. Sometimes a patient makes a complete recovery; sometimes it is only an apparent one. Sometimes the disease is quiescent and latent; sometimes the fatal course is swift. Medical science cannot always detect and describe the progress of the disease. Employees exposed to occupational diseases frequently work for different employers. It is unthinkable that the legislature should have contemplated that in such instances the recovery of compensation should be defeated. The legislature has properly assumed a benevolent care for workmen. The Compensation Act has proved of inestimable benefit not only

to employer and employee, but also to the state generally. The legislature must have intended that compensation should be determined, subject to procedural limitations, when the disability or death occurred, and at no other time. Otherwise, the whole plan would prove ineffective.' Accordingly, when an occupational disease is of a latent and progressive character, and the timeliness of an application for compensation benefits is brought into question, it is essential that the nature of the employment and the operative conditions should be understood as well as the effects upon the individual exposed.

''In the manufacture of silica powder for commercial purposes by the Spicky Polish Corporation, silica rock brought from the quarry to the company's plant is there ground by mechanical processes into a very fine powder, and then deposited in bins, part being sacked and sold in bulk, and part used on the premises in combination with soap in the preparation of the polish. By reason of these operations, the air is constantly thick with minute particles of silica dust, and during the employment of the men in question the factory was not equipped with devices to carry off the dust. Marsh, Lange and Woods were all engaged about the grinding machines and took part also in sacking the product. As a result they all contracted a form of disease of the lungs known as pneumoconiosis silicosis, but the real character of the ailment from which they had suffered was not understood until about a month before the applications of these petitioners were filed.

''It is not the mere inhalation of the dust that causes the pneumoconiosis. A brief explanation of the characteristics of pneumoconiosis is contained in *Sullivan's Case*, 265 Mass. 497 [164 N. E. 457, 62 A. L. R. 1458]; and in medical studies made of late years the process of development of the disease is described with particularity. In general terms this process may be stated in an untechnical way .as follows: The fine particles of dust, when inhaled, lodge on the moist surface of the interior of the lungs. Some are swept out with the normal movement of mucus to the exterior; but many make their way through the lining membrane of the air spaces into surrounding lymph channels, and thence travel toward centrally located lymph nodes, causing their enlargement. This passage through the lining

membrane and into the lymph channels results in tissue damage, probably chemical in its nature, under the influence of alkaline tissue fluids; and the tissue damage in turn causes the congregation of certain cells and the disintegration of others, which, together with the silico particles, tend to choke the lymph channels and hinder or destroy their normal drainage function. The result of this is further tissue damage, with swelling, constriction or obliteration of smaller air spaces, and stagnation of circulation in their walls. Eventually, in progressive cases, many of the original essential structures of the air and circulatory channels, damaged beyond repair, are replaced by scar tissue, medically known as fibrosis; and there is then loss of elasticity, diminution of effective lung surface, and impeded blood circulation through the parts—all combining to produce shortness of breath and labored heart action, which may be sufficient in the end to cause death. Together with these direct effects of the silica particles, the changes they initiate interfere with protective mechanisms against microorganisms and thus favor the development of infections, especially bronchitis, pneumonia and tuberculosis.

"Many circumstances combine to diversify the symptoms, the physical and X-ray findings, and the course of the disease. Depending upon the duration and intensity of the exposure to the dust, the size of the particles, the intercurrence of infections, and the like, the disease may develop within a comparatively few months or may take many years and may even manifest itself only after the lapse of several years following cessation of exposure. In its manifestations it may simulate heart disease or other varieties of lung disease, and in earlier stages it may present but few and ill-defined signs in the stethoscopic and even the X-ray examination. Under these circumstances, it is natural, therefore, that the disease should be frequently overlooked, not only by the sufferer himself, but also by his physician; and that even fatalities from the disease should be sometimes ascribed to other causes, often to the secondary infection, unless the physician is made aware of the preceding exposure to silica dust and has familiarity with the varied manifestations of pneumoconiosis.

"In such an occupational disease, the specific date of origin is impossible of determination. It is the cumulative effect

of exposure day after day that produces the injurious results; and because of the very fact that 'injury', in the statutory sense, is referable to a period of time rather than a point in time, some rational norm must be adopted for determining the 'date of the injury' in the practical application of the statute of limitations embodied in the act. With this in view, we will consider separately the claims of the petitioners.

"The Marsh Case—The application of Irene Marsh for benefits on account of the death of her husband was denied by the Commission, on the ground that the application was barred because death had ensued more than one year from the date of the injury.

"In all these cases, the Commission takes the position that no occupational injury could have occurred after the last day of employment, and that the date of injury for purposes of the act was the day on which the employee's service terminated. The claimants contend, on the other hand, that the date of injury is the time at which a medical practitioner can determine the nature of the disease.

"When Marsh left the employ of the Polish Corporation on February 13, 1928, it was not because any symptoms of lung trouble were manifest at that time, but because of an injury to his hand, which had no influence on the subsequent developments. It was not until December, 1928, that he began to complain of his chest and to lose weight and show marked weakness; and from that time his health continued to decline until his death on February 14, 1930. The cause was, however, not known until an X-ray picture was taken about a week before he died, which showed conditions characteristic of pneumoconiosis.

"The law does not award compensation for mere pain or physical impairment, unless it is of such character as to raise a presumption of incapacity to earn. The object is to make amends for a disability attributable to the employment, and the test is whether there is an incapacity causing loss of earning power in whole or in part. *Hustus' Case*, 123 Me. 428 [123 Atl. 514]. In order to be compensable, disability need not be limited to incapacity of a workman to pursue his ordinary occupation, but embraces impairment of earning power generally. *Gordon* v. *Evans*, 1 Cal. Ind. Acc. Com. (pt. 2) 94; *Savich* v. *Ind. Com.*, 39 Ariz.

266, 5 Pac. (2d) 779. The term 'injury' then is to be understood as connoting a compensable injury, and is correlated to an incapacity or disability justifying a compensatory award. *Dombroski* v. *Jennings & Griffen Co.*, 103 Conn. 720 [131 Atl. 745]. Injury and compensable disability are thus more nearly synonymous expressions than are date of injury and date of accident. *Acme Body Works* v. *Koepsel*, 204 Wis. 493 [234 N. W. 756, 236 N. W. 378].

"In *De la Pena* v. *Jackson Stone Co.*, 103 Conn. 93 [130 Atl. 89], the court speaking of an occupational injury (but with a special exception of the law of Connecticut in mind) says: 'A compensable personal injury is an abnormal condition of a living body which arises out of and in the course of the employment and produces an incapacity to work for the requisite statutory period. It need not be traced to a definite happening or event. It may be caused by accident or disease, and includes diseases peculiar to an occupation except those of a "contagious, communicable or mental nature". The happening or event includes the entire transaction to which the injury is traced, not only the operative causes, but their effect on the body of the injured person.'

"An injury, then, may arise out of, and in the course of, the employment when there is a causal connection between the employment and the injury; but for purposes of compensation the injury dates from the time when the diseased condition culminates in an incapacity for work. It is at that time that the employer's liability becomes fixed; for until then the workman had received no injury in the legal sense, though the seeds productive of the injury had lodged in his frame long before. *Johnson* v. *London Guarantee & Acc. Co.*, 217 Mass. 388 [104 N. E. 735]; *Textileather Corp.* v. *Great American Ind. Co.*, 108 N. J. L. 121 [156 Atl. 840]. When a disease is latent and progressive, it may not culminate until a considerable time after the employment has terminated. So, if the disabling result is delayed, then the injury is correspondingly delayed, and the right to compensation does not accrue until the incapacity occurs.

"Our Compensation Act expressly provides that it shall be liberally construed for the protection of persons injured in the course of their employment, and the purpose of such laws is to protect workmen, in proper cases, from economic insecurity. It is not surprising to find, therefore,

that in those jurisdictions where occupational diseases are compensable, it is almost universally the rule that the injury is not deemed to occur until ascertainable disability results. And it may be noted that in our own state it has been held that an employee is not to be deprived of compensation because he fails to make a correct medical diagnosis. *Winthrop* v. *Industrial Acc. Com.*, 213 Cal. 351 [2 Pac. (2d) 142]; *Singer* v. *Industrial Acc. Com.*, 105 Cal. App. 374, 376 [287 Pac. 567]. The dependency of compensation on ascertainable disability is illustrated in a variety of cases, some being cited in the briefs and others gathered in our own research. In Nebraska the law allows for presentation of a claim a period of six months from the occurrence of the injury. In *Selders* v. *Cornhusker Oil Co.*, 111 Neb. 300 [196 N. W. 316], the applicant, while at work in a cellar, was injured in the back by debris violently thrown against him by a flood of water. The injury was believed to be trivial at the time, and the claimant continued to perform his duties for a few weeks. Thereafter his health declined, but it was not until about nine months later that an X-ray picture disclosed the fracture of a lumbar vertebra. Application for compensation was then made and granted, the court holding that the time began to run only from discovery of his latent and previously unknown injury. A similar situation is exhibited in the recent case of *Kostron* v. *American Packing Co.*, (Mo. App.) 45 S. W. (2d) 871. In *McGuire* v. *Phelan-Shirley Co.*, 111 Neb. 609 [197 N. W. 615], there was injury to a workman's head producing results which, though not immediately appreciable, became serious in course of time. In awarding compensation, the court spoke as follows:

" 'Accidents frequently occur where the true nature of the injury and the resulting disability are not discernible for a considerable time even with the aid of scientific skill. When latent injuries from accidents do not at first indicate disabilities which are compensable, an employee is not necessarily deprived of compensation under the Workmen's Compensation Act, Comp. St. 1922, sec. 3056, for failure to demand his rights under the act before they can reasonably be ascertained. An accident resulting in an injury which proves to be progessive in its nature belongs to that class.' Again in *Travelers' Ins. Co.* v. *Ohler*, 119 Neb. 121 [227 N. W.

449], an employee who received an electric shock, supposedly inconsequential, continued his work for upward of a year before he became incapacitated and had to cease; and in his case also compensation was allowed. Likewise in *City of Hastings* v. *Saunders*, 114 Neb. 475 [208 N. W. 122], the date of injury was declared to be the time of culmination in a compensatory disability.

"Upon the same principle it is held that when a strain is suffered which does not at once disable, but later gives rise to a hernia, the injury occurs when the rupture manifests itself. *Re Brown*, 228 Mass. 31 [116 N. E. 897]; *Hornbrook-Price Co.* v. *Stewart*, 66 Ind. App. 400 [118 N. E. 315]; *Esposito* v. *Marlin-Rockwell Corp.*, 96 Conn. 414 [114 Atl. 92].

"There are several instructive cases also in which injury to an eye was sustained without culminating in blindness until after the lapse of a considerable period. In some of these cases the time for instituting proceedings is made to run only from the time when blindness finally resulted, while in others the date of the injury is fixed as of the time when the diseased condition culminated.

"In *Gunderian* v. *Sterling S. & R. Co.*, 151 La. 59 [91 South. 546], an employee was struck over the eye on January 9, 1919. No concern was felt at the time, but after a period of treatment by a physician during which the sight gradually failed, the plaintiff was sent to a specialist on April 23, and notwithstanding the treatment so received, complete blindness resulted in May. Under the law of Louisiana, proceedings to obtain compensation must be instituted within one year from the time of the injury, and it was not until April 22, 1930, that action was begun. It was contended in defense that the claim was barred; but the court held that symptoms of injury were not sufficient to set the time running, and that the cause of action did not arise until the sight failed. Accordingly the plea of prescription was overruled. This case was followed in *Bagg* v. *Pickering Lumber Co.*, 7 La. App. 63, and *Thompson* v. *Tarver*, 17 La. App. 230 [135 South. 723].

"In like manner in *Acme Body Works* v. *Koepsel, supra*, the court acted upon the principle that injury did not occur, or a right to compensation for partial total blindness arise, until sight had been lost, even though nearly six years had

intervened between the accident and the blindness, and though the claimant's employment had meanwhile changed. The accident had occurred on June 23, 1920, while Koepsel was in the employ of the Acme Body Works, but it was not until July 12, 1926, when Koepsel went to a physician because of a slight accident received that day that it was found that there was a cataract causing industrial blindness. On December 22, 1926, Koepsel filed an application upon which a hearing was had, wherein it was determined that though the blindness was caused by the accident which occurred in 1920, the date of the injury was June 12, 1926, and that the right to compensation from the former employer or the insurance carrier was not barred.

"In other jurisdictions, however, the rule adopted is that the injury occurs when the diseased condition culminates. Such was the rule declared in *Johansen* v. *Union Stockyards Co.*, 99 Neb. 328 [156 N. W. 511], and in *Stolp* v. *Dept. of Labor & Ind.*, 138 Wash. 685 [245 Pac. 20], which are in turn followed in the striking case of *Fee* v. *Dept. of Labor & Ind.*, 151 Wash. 337 [275 Pac. 741]. In that case the applicant suffered injury to the left eye while at work on February 15, 1926, and though there was more or less pain for several months, no permanent injury was apprehended. As pain continued, however, he consulted several specialists, but without getting relief; and in November and December, 1926, and January, 1927, he intermitted his work in order to have continuous treatment. Until February, 1928, the specialists held out hope of vision being restored, but in that month he was told for the first time that there was no hope of cure, and that in a few months he would probably be totally blind in that eye. He thereupon applied on February 7, 1928, for disability compensation, but his claim was rejected by the Board on the ground that it was barred. The order was reversed, however, upon appeal to the Supreme Court, which held that the time did not begin to run until the vision was seriously impaired and it had become manifest that the injury had culminated in a permanent disability.

"A like rule was applied in Missouri, though expressed in different terms, in two recent cases of injury to the eye. It is there declared that in the case of a latent injury the period of limitation begins to run from the time when it

becomes 'reasonably discoverable and apparent that a compensable injury has been sustained'. *Wheeler* v. *Missouri Pac. R. Co.*, 328 Mo. 888 [42 S. W. (2d) 579, 582]; *Young* v. *Management & Eng. Co.*, (Mo. App.) 45 S. W. (2d) 927, 929. In the case of *Johnson* v. *London Guarantee & Accident Co.*, 217 Mass. 388 [104 N. E. 735], and Bergeron's case, 243 Mass 366 [137 N. E. 739], there was a diseased condition due to lead poisoning and in *Textileather Corp.* v. *Great American Ind. Co.*, 108 N. J. L. 121 [156 Atl. 840], death was caused by benzol poisoning. In all these cases the date of the injury was declared to be the time when the accumulated effects first incapacitated the employee for work.

"Our research has brought to our notice also a group of cases in Connecticut, in which disability was caused by pneumoconiosis, which developed as a result of inhalation of silica dust, created by grinding the surface and edges of tools or other articles upon revolving wheels of stone with the use of water, a practice known as 'wet grinding'. In most of these instances tuberculosis, locally called 'grinders' consumption', became superimposed upon the pneumoconiosis. The cases which have engaged our attention in this connection are the following: *Kovaliski* v. *Collins Co.*, 102 Conn. 6 [128 Atl. 288]; *Dombrowski* v. *Jennings & Griffen Co.*, 103 Conn. 720 [131 Atl. 745]; *Mesite* v. *International Silver Co.*, 104 Conn. 724 [134 Atl. 264]; *Cishowski* v. *Clayton Mfg. Co.*, 105 Conn. 651 [136 Atl. 472]; *Romaniec* v. *Collins Co.*, 107 Conn. 63 [139 Atl. 503]; *Jadovich* v. *Collins Co.*, 109 Conn. 62 [145 Atl. 25]; *Rousu* v. *Collins Co.* (December 8, 1931), 114 Conn. 24 [157 Atl. 264]. In the Rousu case pneumoconiosis is thus described: 'Pneumoconiosis is an occupational disease which may develop into tuberculosis. *Madore* v. *New Departure Mfg. Co.*, 104 Conn. 709, 718 [134 Atl. 259]. It has been held to be an injury which occurs when the diseased condition arises, and becomes compensable when that condition yields to the infection and unfits the employee for work. . . . It is a condition which gradually develops and increases, its presence may be unknown and unsuspected during a long period of time, the exact or approximate date of its inception and the rate and degree of its progress from time to time incapable of ascertainment

when the condition finally is manifested and incapacity to work results, as through the intervention of infection.'

"In these Connecticut cases there was exposure to the dust-laden atmosphere for various lengthy periods, ranging from 40 months in an intermittent service during a period of 5½ years in the Rousu case to a period of 23 years continuously in the Kovaliski case, at the end of which time the weakened bodily condition yielded to tubercular infection. In all these cases in which either tuberculosis or pleurisy developed, or death occurred, as a direct result of the primary pneumoconiotic injury, the court held, in concurrence with the Commissioners, that there was evidence sufficient to show an unbroken causation between the conditions of the employment and the secondary injury producing the incapacity for labor, or the death, and that the workman so incapacitated was entitled to compensation and his dependents to death benefits. *Mesite* v. *International Silver Co.*, 104 Conn. 724 [134 Atl. 264]; *Cishowski* v. *Clayton Mfg. Co.*, 105 Conn. 651 [136 Atl. 472]. In other words, when tuberculosis is superinduced by pneumoconiosis and results in disability, the compensable injury occurs coincidentally with the disability.

"In the Romaniec case, pneumoconiosis developed at some time during a service of 11 years as a wet grinder, but not to such extent as to cause disability. At the end of that time Romaniec, acting upon the advice of a physician, returned in 1919 to Poland, where he engaged in farming for 4 years, after which he came again to America, and resumed service with his former employers from February, 1923, to July, 1925, when he became disabled from pleurisy, due to aggravated pneumoconiosis. He worked spasmodically until February, 1926, by which time he became totally disabled. The date when his injury became compensable was found to be July 25, 1925, the time at which the disease culminated.

"In the Jadovich case, the claimant's employment began as a wet grinder in 1907 and continued to October, 1921. Then after an interval he resumed work from November, 1922, to May 5, 1923. In May, 1927, claim for compensation was made upon the ground that in the course of the employment, pneumoconiosis had developed, and that in its

progress it caused the claimant to become disabled on April 12, 1927. At a hearing had on May 23, 1927, the Commissioner found that by reason of his employment Jadovich had a 'first stage pneumoconiosis' but was not then disabled; and the application was dismissed without prejudice to a renewal 'should he be able to prove that he had a real disability because of pneumoconiosis'. The application having been renewed on March 5, 1928, it was then found that the claimant had been totally incapacitated since June 11, 1927, and compensation was accordingly awarded.

"In like manner in *Schaefer & Co.* v. *Eicher,* 185 Wis. 317 [201 N. W. 396], where a tool-grinder became incapacitated, it was held that the date on which he was rendered unfit for work was the date on which liability became fixed.

█ "From our study of the subject we are brought to the conclusion that in the case of a latent and progressive disease, such as pneumoconiosis, it cannot reasonably be said that the injury dates necessarily from the last day of exposure to a dust-laden atmosphere and that the prescriptive period begins to run from that day. Rather, according to our view, should the date of the injury be deemed the time when the accumulated effects culminate in a disability traceable to the latent disease as the primary cause, and by the exercise of reasonable care and diligence it is discoverable and apparent that a compensable injury was sustained in performance of the duties of the employment. . . . In order to justify an award for disability or death due to an occupational disease, there must always be established an unbroken causal connection between the injury and the employment or the condition under which the employee is required to carry on his work. The connection must be such as to show that the disease or injury was proximately caused by the employment or the conditions of work; and when such unbroken chain of causation is found to exist, then all physical consequences flowing from the disease or injury are proper elements for consideration in determining the merits of a claim for compensation or death benefits. *Madore* v. *New Departure Mfg. Co.,* 104 Conn. 709, *supra* [134 Atl. 259]; *Cishowski* v. *Clayton Mfg. Co.,* 105 Conn. 651 [136 Atl. 472]; *Kovaliski* v. *Collins Co.,* 102 Conn. 6, *supra* [128 Atl. 288]; *London G. & A. Co.* v. *In-*

*dustrial Acc. Com.*, 202 Cal. 239, 241 [259 Pac. 1096, 54 A. L. R. 1392] ; *Singlaub* v. *Industrial Acc. Com.*, 87 Cal. App. 324 [262 Pac. 411]. In the cases under consideration the record sufficiently establishes a chain of causation between the conditions of employment and the physical consequences of the disease contracted.''

Respecting the claim for death benefit in the case of Woods, the application was made on October 20, 1930. It was therefore filed more than one year from the date of the death of Woods, August 10, 1929. There is therefore no escape from the mandatory provisions of section 11 (b), subdivision (2), of said act and the action of the Commission in denying relief was clearly correct. The order in this case is affirmed.

In the case of Marsh, who died February 14, 1930, the application was filed on October 20, 1930, which was within one year from the date of death. But the Commission found that death did not ensue within one year after the date of injury as provided by section 11 (b), subdivision (2) of said act. In reaching this conclusion, however, the Commission fixed the beginning of the running of the prescriptive period as of the date the deceased was first disabled from work. This holding is not in consonance with the rule of law laid down above; neither does the evidence disclose when the presence of pneumonoconiosis or silicosis was or should have been diagnosed as the primary and efficient cause of the disability and later the death of Marsh. The award in this case is therefore annulled to the end that further proceedings may be had to ascertain when the statute of limitations began to run.

In the Lange case the Commission made no finding as to the date when the presence of pneumonoconiosis should or could have been discovered as the efficient and primary cause of disability. The conclusion that the claim was barred under section 11 (b), subdivision (1), of the act was reckoned solely from the date when disability first prevented the applicant from working. Under the rule of law declared by this opinion the evidence fails to disclose sufficient data for a conclusion as to when a causal connection between the occupation and the disability was or should have been discerned. The award in this case is, therefore, annulled

to the end that further proceedings may be had not inconsistent with these views.

Langdon, J., Curtis, J., Shenk, J., Seawell, J., and Waste, C. J., concurred.