PAUL G. CORCORAN v. P. G. CORCORAN COMPANY, INC., AND ANOTHER.[1]

July 15, 1955.

No. 36,462.

[1]Reported in 71 N. W. (2d) 787.

Ray G. Moonan and Reynolds & McLeod, for relators.

K. M. Krost, for respondent.

NELSON, JUSTICE.

This matter comes before the court on certiorari upon the relation of employer and its insurer to review a compensation award for accidental injury sustained by employee. The employer, P. G. Corcoran Company, Inc., is a corporation engaged in the manufacture and repair of neon signs. The employee, Paul G. Corcoran, was at the times material here the sole owner of the corporate stock. The corporate officers other than Corcoran were his wife and two other employees.

There is no dispute that the insurer, Iowa Mutual Liability Insurance Company, was the compensation insurer and was the insurer of Corcoran as employee of the corporation for compensation liability. The insurer had insured Corcoran as an individual against compensation liability from January 1, 1946, to April 16, 1949. On the latter date the name of the assured was changed to the corporation. Subsequent to the commencement of this proceeding, the corporation brought an action against the insurer in district court for reformation of the policy, and judgment was entered reforming the policies naming the corporation as the assured for the years 1948 and 1949. No appeal was taken from this judgment. It is therefore clear that for the purposes of this record the insurer insured the corporation on and after January 1, 1948.

The business and related assets of the business Corcoran previously conducted as an individual were duly transferred to the corporation and it began functioning as such as of January 1, 1948. An added side line of electric fixtures also became a part of the corporate business. From the beginning of the corporation Corcoran was its president and manager; his wife was vice president and a director; an employee, F. A. Rossel, was secretary; and another employee, W. J. Deglman, was treasurer. Mr. Deglman was later dropped as

an officer of the corporation, and F. A. Rossel was then made secretary-treasurer. Two hundred shares of stock were issued, all of it held by Corcoran. With the exception of Deglman, the same officers continued on through the years 1948 and 1949.

Prior to the incorporation, Corcoran had operated the neon sign business as an individual. His individual operations began in 1939 and continued through 1941, after which time he engaged in war work at Rosemount, Minnesota, and in Alaska. He reopened his business establishment upon his return, January 1, 1946, and continued to operate as an individual until incorporation in December 1947.

Corcoran was a skilled workman in his own right and prior to the incorporation devoted most of his time outside of managing the business to glass blowing and glass tube bending as a neon sign manufacturer applying his skill to both manufacturing and repair work. After incorporation he devoted about 50 percent of his time to work on neon tubes and repair and the balance to management of the business of the corporation. One of the other employees, who was trained as an electrician, handled the electrical supply side line. Corcoran received a salary of $400 per month from the corporation after January 1, 1948, in return for which he divided his time between repairs and work on neon tubes and signs and corporate business management. This monthly salary amounted to a weekly wage of $92.31.

During the times that he was engaged in the manufacture and repair of neon tubes and signs, both as an individual and as a corporate employee, a substance known as beryllium was used in manufacturing the tubes as a binder for phosphorus necessary to produce fluorescent powder. In the tube bending and glass blowing, a necessary procedure in the manufacture and repair of neon signs, broken tubes at times permitted metallic beryllium in powder form to be scattered about the air and become subject to inhalation. If inhaled in sufficient quantities, it is now known to produce a disease diagnosed as pulmonary berylliosis peculiar to the occupation in which Corcoran was engaged. When contracted, it qualifies in classification as an occupational disease. That the pulmonary berylliosis con-

tracted by employee here was an occupational disease arising out of and in the course of the employment is amply sustained by the record.

This court has held that, where an employee suffers chemical poisoning and the industrial commission finds that there was an "accidental injury," the supreme court will assume that there was injury to the physical structure of the body at the time of the injury, for otherwise there could have been no accidental injury within the meaning of the act. Krause v. Swartwood, 174 Minn. 147, 218 N. W. 555, 57 A. L. R. 611.

We now come to what appears to be the important disputed question—and it is one of fact—when did respondent contract this occupational disease? Was it prior to January 1, 1948, the effective date of the incorporation of the Corcoran neon sign business, or did it occur in 1948 or 1949 or during both of those years? The employee testified that he became exposed to beryllium poisoning at times, from what he learned later, when it became subject to inhalation; that he worked where the dust of that particular metallic substance escaped into the air; and that he was exposed during the years 1939 and 1941 and again in the years 1946, 1947, 1948, and the spring of 1949. For a period of about four years between 1941 and 1946 he was not thus exposed.

His testimony was to the effect that his first notice of any physical disability was while hunting in the fall of 1948. His health had been good, to his knowledge, up to that time. He had no marked difficulty, however, until about March 29, 1949, when he decided to seek medical aid by going to Dr. Henry Bradley Troost of the Mankato Clinic. He was prompted to see the doctor because he had become afflicted with shortness of breath; it was growing worse, a cough had begun to develop, and he decided to go to the clinic for a checkup. He was X-rayed and the film showed a congested lung condition. Dr. Troost put him in the hospital for a short period.

He then went to the Mayo Clinic and was examined by Dr. Corrin Hodgson, whose testimony constitutes a part of the record in this case, and a Dr. Robert Nachtwey of the clinic, on April 11, 1949. He says he was examined thoroughly, X-rayed, and the trouble diag-

nosed as pulmonary berylliosis. On April 23, 1949, a biopsy was done by Dr. Priestly of the Mayo Clinic which consisted of the removal of a lymph node from the left axilla for diagnostic reasons. There was beryllium present in the node which came from a small scar on the fourth finger of his left hand. It was the opinion testimony of Dr. Hodgson, as a medical expert, that neither the scar nor the lymph node came from inhalation of the substance and that neither had any connection with the pulmonary berylliosis as a cause.

While in war work Corcoran had weighed 170 pounds and he says through being furnished good food during the period it was increased to 205 pounds, which was his weight in the early part of the year 1949. When examined at the Mayo Clinic, April 7, 1949, he weighed 189 pounds. He gradually lost weight from that time on and at the time of the hearing was down to 127 pounds. Dr. Hodgson testified that he had been permanently disabled since April 1949. The record shows that he stopped all work March 29, 1949, and later only did what he could in assisting in the management of the corporate business. He continued going to the Mayo Clinic at intervals until August 1952, and was last examined by Dr. Hodgson October 20 and 21, 1952.

It appears to be an established fact that the metal beryllium causes a chronic inflammatory reaction in the tissues of the lungs. The relators in their brief characterized the opinion testimony of Dr. Corrin Hodgson and Dr. O. A. Sander of Milwaukee, to whom Dr. Hodgson submitted the X-ray films for a report, as to its effect, if any, in establishing a period of definite exposure in the following words: "It is not definitely ascertainable as to which period of exposure produced the pulmonary berylliosis. It could have been due to any of the times he was exposed to beryllium—it might have been a singular effect in either period of exposure or it may have been an added effect of the two periods of exposure together."

█ The referee found as a fact that while the employee was employed by P. G. Corcoran Company, Inc., and on March 29, 1949, he sustained accidental injury to his person arising out of and in the course of his said employment by contracting an occupational

disease, to wit, pulmonary berylliosis, which disease was peculiar to the occupation in which the employee was engaged and due to cause in excess of ordinary hazards of employment. Also that the employer had notice and knowledge of the contracting of said occupational disease within the statutory period. The findings were affirmed by the commission.

Employer and insurer say that: "We do not dispute the fact that the disease was due to the nature of the employment and the exposure to beryllium." It is therefore conceded that pulmonary berylliosis is an occupational disease and covered by the workmen's compensation act. However, to entitle a workman to compensation for disability from this disease, he must have contracted it within a certain time previous to his disablement. The statute applicable to this situation is M. S. A. 1945, § 176.66, subd. 3,[2] which reads:

"Neither the employee nor his dependents are entitled to compensation for disability or death resulting from occupational disease, unless such disease is due to the nature of his employment as defined in section 176.01, subdivision 15, and was contracted therein within 12 months previous to the date of disablement; *except in the case of silicosis* or asbestosis, *in which cases the disease must have been contracted within three years previous to the date of disablement."* (Italics supplied.)

We now come to the question whether the occupational disease berylliosis was contracted within 12 months previous to the date of disablement. This court has held that occupational diseases such as silicosis and others that come within the classification of an occupational disease are contracted at the time when the accidental injury resulting therefrom manifests itself so as to interfere with the bodily functions. In Kellerman v. City of St. Paul, 211 Minn. 351, 354, 1 N. W. (2d) 378, 380, this court said:

"* * * In view of the nature of coronary sclerosis, the doubt as to the stage at which it should be characterized as a disease, and especially the negative results flowing from any other construction,

---

[2]L. 1949, c. 500, § 1, an amendment to the statute, was approved April 20, 1949, after disability arose in this case.

we conclude, as did the commission, that coronary sclerosis is 'contracted' within the meaning of the statute when it first manifests itself so as to interfere with bodily functions."

In Yaeger v. Delano Granite Works, 236 Minn. 128, 52 N. W. (2d) 116, this court held that the occupational disease known as silicosis is "contracted" within the meaning of the statute when it first manifests itself so as to interfere with the functions of the body.

There is great similarity in the development of silicosis, coronary sclerosis, and pulmonary berylliosis. In all of such cases many years usually elapse between what may have been the first exposure or the inception of the condition and the resultant disability. Berylliosis, like silicosis, is caused by the infiltration and gathering of substances which affect lung tissue. All of these disabling developments are similar in their progress and each requires a long period of infiltration, accumulation, and development before there is an impairment of bodily functions or a disablement.

In Krzewinski v. Robert Gage Coal Co. 304 Mich. 63, 7 N. W. (2d) 223, a workmen's compensation case involving disablement caused by silicosis, where there was a one-year limitation, the Michigan court approved the reasoning and decision in Kellerman v. City of St. Paul, *supra,* and held that silicosis is contracted, within terms of the compensation act providing that silicosis is not compensable unless contracted within one year of the disablement, when the symptoms appear and not when a deposit of silica in the lungs begins.

In Matter of Daley v. Miner Lithographing Co. 236 App. Div. 549, 261 N. Y. S. 189, a New York case involving lead poisoning, the industrial board found that the injury was contracted within a year prior to claimant's disablement as required by § 40 of the workmen's compensation law of that state. The appellate division reversed the industrial board on the ground that the evidence failed to show that the lead poisoning was contracted within the year of limitation. This decision was reversed by the court of appeals without opinion in 262 N. Y. 542, 188 N. E. 56. It appears quite clear from this case that New York follows the same interpretation of the meaning of "contract" in the section of the compensation law involving occupa-

tional diseases for the purposes of the one-year limitation period as do Michigan and Minnesota.

This court in deciding the Yaeger case quoted the Krzewinski case as follows (236 Minn. 134, 52 N. W. [2d] 119):

"* * * we are of the opinion that in order that the statute may be effective and purposeful, it must be construed as providing that the date of contracting starts when symptoms appear. Otherwise, since it takes so long for the deposits to build up so that symptoms appear, the section of the statute requiring that contracting of the disease must come within one year of the disablement would, in an effective or practical sense, take away all the benefit of the section making the disease compensable."

Clearly, pulmonary berylliosis comes within the class of occupational diseases and we are unable to see any distinction between silicosis, coronary sclerosis, and berylliosis when applying the statutory limitation. Therefore, the statute in the case at bar does not commence to run until the victim has "contracted" the disease, and the process of contracting the disease does not cease until physical impairment manifests itself. If the employee had no symptoms of pulmonary berylliosis until well within the one-year limitation, he is not barred by the limitation and he is entitled to recover whatever is due him under the provisions of the workmen's compensation act against the employer by whom he was employed when the disablement first manifested itself. It appears that in those jurisdictions where occupational diseases are compensable, it is almost universally the rule that the injury is not deemed to occur until ascertainable disability results.[3]

The testimony of the employee in the instant case is, without dispute, that he first noticed shortness of breath while on a hunting trip in the fall of 1948; that he first definitely noticed a cough due

---

[3]See Marsh v. Industrial Acc. Comm. 217 Cal. 338, 18 P. (2d) 933, 86 A. L. R. 563, and Annotation at 572, for the statement that the great weight of authority holds that the statute does not begin to run where disability results from occupational disease until the disease is manifest. 24 Calif. L. Rev. 594.

to something other than smoking in the first part of the year 1949; and that actual disablement occurred on March 29, 1949, within a five-months period after he noticed the first symptom or impairment of bodily function, namely, shortness of breath. There is no testimony that any symptoms or impairment of bodily functions appeared prior to five months before the actual disablement manifested itself.

■ Another point stressed by the employer and insurer is that, since Corcoran was the president and the sole owner of the corporate stock, he was not an employee in fact and that the relationship of employer and employee did not exist, and cannot exist, citing Donaldson v. William H. B. Donaldson Co. 176 Minn. 422, 223 N. W. 772, and Erickson v. Erickson Furniture Co. 179 Minn. 304, 229 N. W. 101. They so contend even though in 1947 the legislature amended the act and provided by M. S. A. 1949, § 176.01, subd. 8(3), that the terms "employee" and "workman" should be construed to mean "Every executive officer of a corporation," and subd. 17 of the same section defined an executive officer as follows:

" 'Executive officer of a corporation' means any officer of a corporation elected or appointed in accordance with its charter and by-laws."

They argue that the 1947 amendment motivated the commission to find that Corcoran was an employee; that there was a blind following of the amendment without giving it the reasonable construction it deserved and without regard to the effect of its determination which they characterize as follows: The establishment of an artificial relationship; opening the door to fraud; and charging the industry with an unjust burden.

It might be well to say at this point that, while the well-considered opinions in the Donaldson and Erickson cases are not controlling on the point under discussion since the 1947 amendment, yet, it continues to be the rule that each case must be determined on its own set of facts. The triers of fact must be relied upon, in the first instance, to screen the unjust from the just claims protected by an adequate remedy through the workmen's compensation act, which has been designed to meet the vital needs of a changing society.

The employer-employee relationship is a relation which is affected by a vital public interest, and therefore it may be and is regulated under the police power. This is a legislative privilege. Unless it is exercised arbitrarily so that it becomes violative of the constitutional rights of the citizen, the courts cannot interfere. Amendments to the original workmen's compensation act making it compulsory and exclusive are the result of legislative discretion which the legislature was privileged to exercise under the police powers of the state. Breimhorst v. Beckman, 227 Minn. 409, 35 N. W. (2d) 719; Fox v. Swartz, 228 Minn. 233, 36 N. W. (2d) 708; 3 Dunnell, Dig. (3 ed.) §§ 1603, 1604.

Mr. Justice Magney, speaking for this court in Delaney v. Dan Delaney, Inc. 227 Minn. 572, 577, 36 N. W. (2d) 12, 15, stated:

"In determining whether an officer is also an employe, it is of course evident that each case must be determined on its own set of facts, which makes it difficult to lay down a hard and fast rule to cover the various situations. * * *

"'* * * Consideration must be given to the degree of control exercised over the business, the actual business relations between the corporation and the officer, *the type of services performed, the regularity thereof,* * * *.'" (Italics supplied.)[4]

Since the 1947 amendment, this court has determined in Cosgriff v. Duluth Firemen's Relief Assn. 233 Minn. 233, 46 N. W. (2d) 250, that by virtue of M. S. A. 1949, § 176.01, subd. 8(3), enacted in 1947, the definition of employee under the workmen's compensation act has been extended to include "Every executive officer of a corporation." An executive officer is defined in § 176.01, subd. 17, as "any officer of a corporation elected or appointed in accordance with its charter and by-laws." The term "employee" is defined in § 176.01, subd. 8(2), of the compensation act as "Every person in service of another under any contract of hire, expressed or implied, oral or written."

---

[4]See, March v. March Gardens, Inc. 203 Minn. 195, 280 N. W. 644; Columbia Cas. Co. v. Industrial Comm. 200 Wis. 8, 227 N. W. 292; Milwaukee Toy Co. v. Industrial Comm. 203 Wis. 493, 234 N. W. 748.

■ The contention of the employer and insurer that the amendment of 1947 is not generally applicable to "one man" corporations and that therefore the corporate entity should be disregarded in the instant case is not persuasive. The basic theory of corporation law is that a corporation exists as an entity entirely separate and apart from its shareholders. Mr. Justice Stone, speaking for this court in In re Trust Under Will of Clarke, 204 Minn. 574, 577, 284 N. W. 876, 878, said:

"We reject as fundamentally unsound and obsolete the thesis that a corporation can be regarded for any purpose as a mere fiction of law."

See, General Underwriters, Inc. v. Kline, 233 Minn. 345, 46 N. W. (2d) 794; Milwaukee Toy Co. v. Industrial Comm. *supra;* Columbia Cas. Co. v. Industrial Comm. *supra.*

The fundamental purpose of our workmen's compensation act is to provide compensation to workmen injured by accident while performing their work. Corcoran was a workman who was skilled and who put in 50 percent of his time in that capacity. The fact that he was president of the corporation and that he acted in a managerial capacity part of the time does not exclude him from classification as an employee in the instant case.

■ M. S. A. 176.66, subd. 5, of the compensation act provides:

"The total compensation due for occupational disease is recoverable from the employer who last employed the employee in the employment to the nature of which the disease was due and in which it was contracted. If such disease was contracted while such employee was in the employment of a prior employer, the employer who is made liable for the total compensation, as provided by this subdivision may appeal to the commission for an apportionment of such compensation * * * and the apportionment determined only after a hearing, notice of the time and place of which is to be given to each employer alleged to be liable for any portion of such compensation."

Said subd. 5, providing for apportionment, does not, in referring to the employment to the nature of which the disease was due and in

which it was contracted, use the words "or in which he was exposed." Clearly, there may be cases where the employee has in fact contracted the disease in a prior employment within M. S. A. 1945, § 176.66, subd. 3, and there is sufficient proof that his condition has gone beyond the stage of mere exposure and absorption of deleterious substances. No doubt there are cases where the contraction of the occupational disease is clearly and definitely ascertainable at a certain time where the employee may continue to work without any serious disablement for another employer or other employers before disablement overtakes him to the extent his earning power is lost. Compensation is not awarded for mere pain or physical impairment but for the resulting loss of earning power. The physical impairment period must be of such character as to raise a presumption of incapacity to earn. As has been said: "The object is to make amends for a disability attributable to the employment, and the test is whether there is an incapacity causing loss of earning power in whole or in part." Marsh v. Industrial Acc. Comm. 217 Cal. 338, 344, 18 P. (2d) 933, 936, 86 A. L. R. 563, 567.

Apportionment statutes similar to ours are to be found in the states of New York, Michigan, Rhode Island, and California. In Matter of Haglund v. Bayer Co. 243 App. Div. 840, 278 N. Y. S. 451, the Bayer Company sought to apportion the award between the two employers and their carriers. Claimant had been employed for a number of years by the H. A. Metz Laboratories, Inc., and during a part of that period had occasion to use benzol in his employment. Leaving their employ he entered the employment of the Bayer Company in the use of benzol between the dates of August 1931 and November 8, 1931. He was stricken with benzol poisoning on the latter date. There was no history of prior poisoning having manifested itself. Under the facts of that case it was held that the compensation award would not be apportioned between employer and former employer and industrial board was unanimously affirmed. In Rhode Island the case of Esmond Mills v. American Woolen Co. 76 R. I. 214, 68 A. (2d) 920, involved the application of the section of the workmen's compensation act providing for apportionment of occupational disease in that state. It involved the occupational dis-

ease of dermatitis. The employee had clearly contracted the disease in a prior employment. It was held that the special facts of that case gave no right of immunity from contribution. It is clearly distinguishable from the facts presented by the record in claimant's case. In Rubattino v. Industrial Acc. Comm. 65 Cal. App. (2d) 288, 150 P. (2d) 538, the court held in a case involving apportionment that the evidence was insufficient to establish that conditions in the employment of certain prior employers had substantially and proximately contributed to the disease silicosis and denied apportionment. The California court recognized a distinction between mere exposure to and absorption of deleterious substances into the body and a known or probable prior diseased condition of the body when it comes to a consideration of the one-year period of limitation. Many state statutes make the last employer solely liable with no right of apportionment, some in all occupational diseases, and others only in silicosis, asbestosis, and similar diseases.[5]

Here there is no evidence that any of the exposures with absorption of deleterious substances prior to fall of 1948 were so substantial and definite as to be the proximate cause of the disease. No doctors were consulted, no X rays were taken until after March 29, 1949, the date of disablement and the beginning of the loss of earning power. On the state of the record before us there is no basis for establishing or designating a particular prior time as the date of the contraction of the disease. There is no testimony whatever that any symptoms or impairment of bodily functions appeared prior to 12 months before the disablement. The direct testimony of the claimant shows that he had no symptoms of disablement or disease prior to November 15, 1948, when for the first time he detected a shortness of breath on a hunting trip. The opinion testimony of the medical experts was in the speculative field as to when the disease first asserted itself. This testimony indicated that the disease might be rapid or gradual, there being so many variations in the disease that could not be well explained; that the changes brought about by beryllium could occur in a matter of days or weeks or might occur

[5]See section on occupational diseases in workmen's compensation acts of Illinois, Indiana, Utah, Virginia, Pennsylvania, North Carolina, and Florida.

in years, the latter the more probable; and that it would also probably depend on the degree and quantity of exposure.

No doubt much may depend in the incurring and development of berylliosis and similar diseases such as silicosis on the constitution of the employee, the conditions under which he works, varying physical changes from time to time, and the immunity from disease some men appear to possess to a greater degree than other men. Under the circumstances the words "contract" or "contracted," when used in connection with the occupational disease involved, based upon the within state of facts, can have no different interpretation under M. S. A. 176.66, subd. 5, than it has received and which this court has followed here in applying M. S. A. 1945, § 176.66, subd. 3.

We must conclude, where, aside from resorting to speculation, there is no evidence that the employee had contracted berylliosis in any specified period of employment prior to disablement and evidence as to periods of work and conditions of former employments form no substantial evidentiary basis for an inference that his health was impaired or that he had a disease at that time which could have been aggravated during some reasonably definite period of his last employment, and where the statute involved deals only with employment or employments in which it was "contracted," that the basis is insufficient for compensation award against all employers rather than against the last employer.

■ If from the evidence it were made to appear that an employment has caused the occupational disease known as berylliosis, or a similar one, and its history established, which was aggravated by a subsequent employment, the burden of compensating the employee for the resulting disablement would be properly divided among the employers upon whom liability exists under M. S. A. 176.66, subd. 5. We fail to find, however, any basis for the application of the apportionment statute to the facts of the case before us.

■ This court's scope of review of a decision of the industrial commission by means of certiorari is fully stated in 6 Dunnell, Dig. & Supp. § 10426, and cases cited. It has observed the rule that the findings of the industrial commission on fact questions will not be disturbed unless consideration of the evidence with permissible

inferences which may be drawn therefrom compel or require reasonable minds to adopt contrary conclusions. This matter was recently discussed by this court in Chillstrom v. Trojan Seed Co. 242 Minn. 471, 479, 65 N. W. (2d) 888, 894.[6]

We come to the conclusion that the commission was clearly acting within its rights when it found the facts as it did and that employee is entitled to compensation as awarded. The employee is allowed $250 attorney's fees in this court.

Affirmed.

---

[6]See, also, Tillman v. Stanley Iron Works, 222 Minn. 421, 24 N. W. (2d) 903; Jones v. Excelsior Laundry Co. 183 Minn. 531, 237 N. W. 419; Walker v. Minnesota Steel Co. 167 Minn. 475, 209 N. W. 635.