[Civ. No. 8393.   Third Dist.   June 4, 1954.]

GLOBE INDEMNITY COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, JOHN JAMES TREMBATH et al., Respondents.

R. P. Wisecarver for Petitioner.

T. Groezinger for Respondents.

PEEK, J.—This is one of four petitions for review of an award of disability benefits made by the respondent commission to the respondent Trembath. (See *Idaho-Maryland Mines Corp.* v. *Industrial Acc. Com., post,* p. 874 [271 P.2d 155]; *Pacific Emp. Ins. Co.* and *Empire Star Mines Co., Ltd.* v. *Industrial Acc. Com., post,* p. 875 [271 P.2d 155]; and *United States Fidelity & Guaranty Co.* v. *Industrial Acc. Com., post,* p. 875 [271 P.2d 155].) The award was based on findings that the employee's disability from silicosis was contributed to and caused by his employment by the Empire Star Mines Company, Ltd. and the Idaho-Maryland Mines Corporation during the periods of May 1, 1929, to March 30, 1938; and January 22, 1945, to July 25, 1949.

Since the basic facts and issues, as well as the contentions made and the authorities cited in support thereof, are essentially the same, our determination of this petition will necessarily be determinative of the other three.

The record establishes that for a period of five years beginning May 1, 1929, through April 30, 1934, the Empire Star

Mines Company, Ltd., was permissibly self-insured. For the first year of this period (May 1, 1929, through April 30, 1930) the Globe Indemnity Company insured this employer's workmen's compensation liability, for indemnity benefits only, in excess of $1,000. During the remaining four years of this self-insuring period (May 1, 1930, through April 30, 1934) the United States Fidelity and Guaranty Company insured this employer's workmen's compensation liability, for indemnity benefits only, in excess of $5,000.

From May 1, 1934, through July 25, 1949, the Pacific Employers Insurance Company was the workmen's compensation insurance carrier for the Empire Star Mines Company, Ltd.

The record also establishes that the Idaho-Maryland Mines Corporation was permissibly self-insured during the period of June 11, 1938, through August 15, 1942, and January 2, 1945, through January 20, 1945.

The employment record of Trembath shows his work as a miner began in England at the age of 14; from approximately 1909 until his disability in 1949 he worked at different mines in various western states. At the outset of the hearing he elected to proceed against the Empire and the Idaho-Maryland mines. His employment record with these two companies shows work for Empire as a pumpman from May 1, 1929, through January 4, 1937; as a shift boss from January 5, 1938, through March 30, 1938; and as a pumpman from January 22, 1945, through July 25, 1949. From July 11, 1938, through July 15, 1942, and from January 2, 1945, through January 20, 1945, he worked as a mine and timberman for Idaho-Maryland. The record further shows that at all times subsequent to May 1, 1929, Empire operated the Pennsylvania Mine and the Empire Mine, and that from June 11, 1938, through August 15, 1942, and from January 2, 1945, through January 20, 1945, Idaho-Maryland operated the Brunswick Mine. During the years from 1938 until 1945 Trembath was employed in San Francisco Bay area defense work; he was employed by the Moore Shipbuilding Corporation as a fire guard, and by Hall-Scott Motor Company as an operator of a machine sanding crankshafts.

Trembath's testimony concerning conditions which existed while he was working in the Pennsylvania Mine was that from the time he started until he left he worked as a pumpman, which required him to look after all of the pumps which were in use at that time; that this work took him throughout and

upon all levels in the mine; that when he first went on the pumps there conditions were "pretty bad"; that there was considerable smoke and gas, and "dust probably," because the blasting was close to the shaft; that these conditions continued as long as there were two shifts working, but after the mine went on one shift the conditions improved. In regard to his employment as a shift boss in 1937 and 1938, he testified that it was his job to go through the mine twice each shift; that in some places the air conditions were "pretty bad." His testimony concerning his work in the Brunswick Mine of the Idaho-Maryland Mining Corporation was that he did no mining there—only timbering, and after an injury received on that job, he was given lighter work greasing cars, which work however continued underground. He further stated that when greasing cars it was necessary to go all over the mine; that sometimes his work would take him very close to mining operations, particularly when he was timbering. He also testified that the air in that mine seemed fairly good except for one place, but because of the ventilation system the dust and smoke would clear out faster. Following his return to work in the Empire Mine in 1945, he went back on the pumps. This work took him on various levels of the mine where pumps were operating, and he testified that the air was pretty good in the shafts where he was working.

Conflicting testimony was given by one Charles H. Plumbtree, a safety engineer employed by the Empire Star Company since 1938. He testified that by 1926 or 1927 all drilling by that company was conducted by the wet method; that by November, 1929, the North Star Mine was connected to the Empire Mine to increase the ventilation, and in the space of a few years blowers were installed to take care of the expansion program. He also testified that it took a few years to get the ventilation into full operation; that during the early periods of dry drilling and dry mucking, the mines were dusty—this condition could be observed on the walls and on the timbers—but that after the ventilating system was installed, together with wet drilling and wet mucking, there was no dust. In comparing the dust conditions before and after the improvements he stated that originally dust could be seen, but that since the change there was no dust. He also testified that from 1935 on dust counts were taken periodically, and that he had accompanied a Mr. Finn in making dust counts throughout the mines during the different years that they were taken, and that such counts were repre-

sentative of the mines at those times. A miner employed by Empire was called and testified that by 1929 the mine was using wet drills exclusively; that the miners were instructed to wet down the muck, and that the ventilation was good. Another employee of Empire testified that he had worked in the Pennsylvania Mine since 1935, and had likewise accompanied Finn while he was taking dust counts. He further testified that during Trembath's employment as a pumpman from 1935 to 1938 he performed duties from 1,500 to 2,000 feet from the nearest workings; that while Trembath was employed as a shift boss he did no drilling nor mucking, but it was necessary for him to go throughout the mine. This witness also testified that during these periods wet drilling was used exclusively and the mine was considered a wet mine. A chemical engineer and dust counter, John Finn, testified that he had been doing such work since 1919, using the same procedure as is followed by federal and state agencies, and more recently by the United States Navy for testing particles in the upper atmosphere. He further testified that in 1935 there were 120 miles of open tunnels, 60 per cent of which were covered by his report; that at the time air samples were taken, wet drilling was being conducted, and the samplings were made with the objective of getting samplings at the places where men were working and to get them as close to the face of the driller as possible. Finn's reports indicated that dust counts were taken in October, 1938; June, 1941; January, 1946; October, 1947; October, 1949; May, 1951; and April through June, 1935. All such counts showed the amount of dust to be less than the standard set by the Industrial Accident Commission.

The evidence concerning Trembath's medical history shows that he stopped operating drilling machines in 1925 and obtained work as a pumpman because of shortness of breath, and while it is true that he again experienced shortness of breath and coughing in 1942, it was not until July, 1949, that he was unable to continue working. He had been losing weight, experienced shortness of breath and general weakness. The doctor with whom he consulted hospitalized him for approximately a week and thereafter returned him to the hospital for a period of six weeks. He had no chest pains and no chest X rays were taken. However metabolism, blood and cardiograph tests were made, and his case was diagnosed as chronic myocarditis. He continued under that physician's care until August, 1951. X rays which were taken showed an infec-

tion of the right lung, so he was again hospitalized and a right lower lobectomy was performed. One doctor testified he could have had an abscess of the lung which could be wholly unrelated to his silicotic pathology. It was not until this period of hospitalization that he was informed he had silicosis. Reports of various doctors in the spring of 1952 discussed his case as stage two silicosis and tuberculosis. His disability was stated to be permanent so far as any heavy physical work was concerned. Various percentages of disability as it related to his years of employment were given; that is, one doctor estimated 75 per cent could be ascribed to silicosis and 25 per cent to his age; a second doctor expressed the opinion that 80 to 90 per cent of his disability was attributable to his early years of employment.

As previously stated, all of the contentions made by petitioners, that is, insufficiency of the evidence to support the award; impropriety of the award as to the excess carriers; failure to apportion the award; and the applicability of the statute of limitations, are substantially the same as are the authorities cited in support thereof.

It would seem that since the case of *Colonial Ins. Co. v. Industrial Acc. Com.*, 29 Cal.2d 79 [172 P.2d 884], there could be no question of the right of a disabled employee to proceed against "any one or more of successive employers or successive insurance carriers," (p. 82) and if the "disease and disability were contributed to by the employment . . . [he could] have an award against any or all of them for the whole disability. . . ."

The precise situation is again presented in this case. The employee, Trembath, elected to proceed against his last two successive employers, Empire Star and Idaho-Maryland companies and their insurance carriers. Each petitioner, however, contends that the record contains no evidence to support the commission's finding that the employee suffered injury arising out of the course of his employment while that particular petitioner was the employer or insurance carrier. Here it should be noted that, although such contention is made by all petitioners, and each in turn restates the evidence as it sees it, only one petitioner, and then in only one instance, makes any specific reference to the record.

At the outset it must be noted that an ". . . employer takes the employee as he finds him at the time of employment and when subsequent injury lightens up or aggravates a previously existing condition rendering it disabling, liability for

the full disability without proration is imposed on the employer.'' (Pp. 83 and 84.) It therefore is of no consequence whether Trembath's terminal employments were the sole proximate cause for his disability or whether such employments merely aggravated a preexisting condition.

█ It is true that there can be no question but that Trembath's greatest exposure took place in the early years of his work as a miner when dry drilling was the only method used. But it is not true that the record contains no evidence of exposure from 1929 to 1949 as petitioners contend. As we previously stated in our summary of evidence, Trembath testified that there were portions of each of the mines in which he worked where the conditions were ''pretty bad.'' Thus under the mandatory rule set forth in section 3202 of the Labor Code relative to the liberal construction of the Workmen's Compensation Act, it necessarily follows that since the testimony shows that Trembath was exposed to dust during the years in question, and since the medical testimony established that he was disabled from silicosis, he has proven a prima facie case. (See *Industrial Indem. Exch.* v. *Industrial Acc. Com.*, 87 Cal.App.2d 465 [197 P.2d 75].) Whether or not the petitioners met the burden of proof thereby cast upon them to prove that his exposure while in their employ could not have contributed to his disability was essentially a question of fact to be resolved by the trier of fact. (87 Cal.App.2d 465.)

Only two factual situations are, or could be, relied upon by petitioners to refute Trembath's case—the changeover from dry to wet drilling, and the dust counts. The first would be no more conclusive that there was no dust thereafter than would the seven dust counts which were taken over a period of 20 years be conclusive that during all of that period his employment was free from silica dust. The commission was not compelled to accept either petitioners' summary of the evidence or the inference they have drawn therefrom.

As regards the next question raised by petitioners, that of apportionment, the Supreme Court in the Colonial Insurance case held that when a disabled employee has produced sufficient facts to show himself to be disabled from a progressive occupational disease—

''To require [him] . . . to fix upon each of the carriers or employers the precise portion of the disability attributable to its contribution to the cause of the malady is not in con-

sonance with the required liberal interpretation and application of the workmen's compensation laws. The successive carriers or employers should properly have the burden of adjusting the share that each should bear and that should be done by them in an independent proceeding between themselves. They are in a better position to produce evidence on the subject and establish the proper apportionment. All of them may have contributed to the disability and the employee should be permitted to proceed against and have an award against any or all of them for the whole disability if the evidence discloses that he was exposed to silica dust during his period of employment with each of the employers named." (P. 82.)

■ Hence Trembath, having established that during his two terminal employments he was so exposed and disabled, was not required to establish the precise portion of his disability attributable to each. That is the problem of the respondents, to be decided by them in an independent proceeding.

■ The final contention made that Trembath is barred by the statute of limitations is also answered by the same case. There the court, quoting from an earlier case held that—

"In dealing with the question of when the statute of limitation commences to run in progressive occupational disease cases this court has said: 'An injury, then, may arise out of, and in the course of, the employment when there is a causal connection between the employment and the injury; but for purposes of compensation the injury dates from the time when the diseased condition culminates in an incapacity for work. It is at that time that the employer's liability becomes fixed; for until then the workman had received no injury in the legal sense, though the seeds productive of the injury had lodged in his frame long before.' (*Marsh* v. *Industrial Acc. Com.*, 217 Cal. 338, 345 [18 P.2d 933])." (P. 83.)

We find no merit in the contention that Trembath knew or should have known that the acute condition which caused him to leave work in 1949 was caused by or due to the same silicotic condition that had been bothering him ever since 1925.

■ Whether or not such a progressive disease has progressed to a point which constitutes compensable disability, and whether or not the employee had knowledge or should have known of his condition, are primarily questions of fact to be determined by the commission.

*"The question regarding a claimant's possession of knowledge of the cause of his ailment,* or as to whether the disease has progressed to an extent which constitutes compensable disability, is primarily one of fact to be determined by the commission. This court will not interfere with the commission's finding in that regard provided it is supported by substantial evidence or reasonable inferences drawn from the testimony adduced. (*Morrison* v. *Industrial Acc. Com., supra,* 29 Cal.App.2d 528, 533 [85 P.2d 186])." (Emphasis added.) (*Alford* v. *Industrial Acc. Com.,* 28 Cal.2d 198, 204 [169 P.2d 641].)

The award is affirmed.

Van Dyke, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied June 29, 1954.