[Civ. No. 10634. Third Dist. Aug. 29, 1963.]

PACIFIC EMPLOYERS INSURANCE COMPANY et al.,
 Petitioners, v. INDUSTRIAL ACCIDENT COMMIS-
 SION, CLYDE A. SNELL et al., Respondents.

Mullen & Filippi, Mullen, Filippi & Twohy and John A. Thompson for Petitioners.

Rupert A. Pedrin, R. P. Wisecarver, Everett A. Corten, Gladstein, Anderson, Leonard & Sibbett and Ewing Sibbett for Respondents.

PIERCE, P. J.—Petitioners seek annulment of an award of respondent commission. Petitioners allege that by this award petitioner Empire Star Mines Company, Ltd. (hereinafter ''Empire Star'') through its insurer, petitioner Pacific Employers Insurance Company, is required to bear the burden of the entire compensation payable to respondent Clyde Snell for silicosis-produced disability, although employment by Empire Star was only the last (and briefest) of a series of employments where exposures causing the disability existed.

The award was made under Labor Code section 5500.5 and the result, asserted to be inequitable and unconstitutional, springs from an amendment of that section in 1959 (Stats. 1959, ch. 1208, p. 3296).

Pertinent here is that portion of section 5500.5 providing that "[i]n any case involving a claim of occupational disease contracted as a result of more than one employment, the employee making the claim . . . may elect to proceed against any one or more of the employers named in the application. . . . [A]ny award which the commission shall issue awarding compensation benefits shall be a joint and several award as against any two or more employers who may be held liable for compensation benefits." Also pertinent is the further provision in the section that at any time within a year after an award the employers held liable may institute proceedings before the commission to determine proportionate liability and to obtain contributions from other chargeable employers.

The section as originally enacted in 1951 (Stats. 1951, ch. 1741, p. 4154) included a provision recognizing that the subsequent proceeding would be ineffectual to the extent that other employers from whom contributions were sought (or their insurers) were beyond the commission's jurisdiction or were insolvent. The Legislature stated: "It is inequitable that total ultimate liability should fall on one or more such employers who happen to be solvent or have solvent insurance carriers within the commission's jurisdiction or in reach of its process." Therefore, in silicosis cases the commission was authorized, in the apportionment proceedings, to make an award to the paying employer or employers out of the Subsequent Injuries Fund[1] "in an amount equal to the unreimbursed portions of the original payment or payments to which such employer or employers are found entitled. . . ."

The 1959 amendment deleted this right of access and, as stated above, it is this deletion which petitioners contend renders the section (as applied to them under the facts found)

---

[1] The Subsequent Injuries Fund (Lab. Code, § 4751 et seq.) was created in 1945 (Stats. 1945, ch. 1161, p. 2209). It provides additional compensation payable by the state under specified conditions to a previously permanent partially disabled employee who receives a subsequent injury resulting in additional disability. (§ 4751.) The purpose was to encourage disabled persons to seek employment (*Ferguson* v. *Industrial Acc. Com.*, 50 Cal.2d 469 [326 P.2d 145]), and to encourage employers to hire disabled persons. (*Subsequent Injuries Fund* v. *Industrial Acc. Com.*, 39 Cal.2d 83 [244 P.2d 889]; *State of Cal.* v. *Industrial Acc. Com.*, 147 Cal.App.2d 818 [306 P.2d 64].)

obnoxious to the Fourteenth Amendment of the Constitution of the United States.

The facts found by the commission (and it is not contended that substantial evidence does not support them) are that applicant Snell sustained injury consisting of the industrial disease of silicosis arising out of and in the course of his employment by Lava Cap Gold Mining Corporation (hereinafter "Lava Cap"), self-insured, and by petitioner Empire Star, insured by petitioner Pacific Employers Insurance Company. The disease culminated in a disability on May 21, 1956. The commission found, "Said disease of silicosis resulted from exposure to harmful dust over a period of many years." The evidence showed that commencing in 1934 Snell had worked underground in gold mines in Colorado a total of five and one-half years; that in 1940 he moved to California and was subsequently employed by Lava Cap for 21 months. Thereafter between October 7, 1947, and January 5, 1948, and for two days in 1950, Snell was employed by Empire Star (a total of 68 shifts). During all of said employments he was exposed to silica dust. An award was made by the commission in favor of Snell and against Lava Cap and Empire Star "jointly and severally." Lava Cap has not contested the award and its appears it is insolvent, although as a self-insured employer it has deposited $25,000 in United States bonds to secure payment of claims.

The contention of petitioners can be stated more specifically as follows: that a rule subjecting one or two out of a greater number of successive employers to several liability for an entire award of compensation for disability caused by an occupational disease is unconstitutional (violating due process) when the paying employers cannot with certainty obtain reimbursement for excess payments; that unconstitutionality is obviated if the law creating such liability provides such reimbursement out of public funds; but that withdrawal of the fund for reimbursement will leave the exaction of liability again offensive to due process as an unauthorized taking of private property.

It at once becomes apparent that petitioners' theory hinges upon the soundness of its premise; because if liability could originally validly exist without provision for public fund reimbursement the fact that the Legislature first granted, then withdrew, the benefit would not violate any constitutional guaranty—at least under the facts here. It would simply

be a case where "the Legislature hath given; the Legislature hath taken away, blessed be," etc.

Respondents argue that such liability without right of reimbursement from public funds *did* originally exist here—not by statute but by case law; that the Legislature in enacting section 5500.5 merely codified the existing rule. They cite and rely upon *Colonial Insurance Co.* v. *Industrial Accident Com.*, 29 Cal.2d 79 [172 P.2d 884], decided in September 1946, in which our State Supreme Court (per Justice Carter) asserted the rule (on p. 82):

". . . [I]n progressive occupational diseases . . . the employee may, at his option, obtain an award for the entire disability against any one or more of successive employers or successive insurance carriers if the disease and disability were contributed to by the employment furnished by the employer chosen or during the period covered by the insurance even though the particular employment is not the sole cause of the disability."

At the time that decision was made, there was no fund out of which refunds could be sought or made.

*Colonial Insurance Co., supra,* was followed by this court in two cases, *Industrial Indemnity Exchange* v. *Industrial Accident Com.*, 87 Cal.App.2d 465 [197 P.2d 75], and *Globe Indemnity Co.* v. *Industrial Accident Com.*, 125 Cal.App.2d 763 [271 P.2d 149], in the latter of which the court (per Justice Peek) said on page 768:

"It would seem that since the case of *Colonial Ins. Co.* v. *Industrial Acc. Com.*, 29 Cal.2d 79 [172 P.2d 884], there could be no question of the right of a disabled employee to proceed against 'any one or more of successive employers or successive insurance carriers,' (p. 82) and if the 'disease and disability were contributed to by the employment . . . [he could] have an award against any or all of them for the whole disability. . . .' "

The question of due process seems not to have been raised in *Colonial Insurance Co., supra.* Neither was it raised in the two cited cases following and reasserting its rule. Therefore the rule must now be tested against such attack.

■ Our original Workmen's Compensation Law adopted in 1913 (Stats. 1913, p. 279) under state constitutional authorization in 1911 (art. XX, § 21, p. 2179) was upheld generally against a claim of unconstitutionality (violation of due process and equal protection of law) in 1915 in *Western*

*Indemnity Co.* v. *Pillsbury,* 170 Cal. 686 [151 P. 398]. The holding of the court that the act was a valid exercise of the police power included a statement (on p. 694) that "[t]he broad and all-pervading scope of this power makes a satisfactory definition of it impossible" but, says the court, "[f]or the purposes of this discussion, the police power is, we think, adequately and well described by the Supreme Court of Washington in these words: 'By means of it, the legislature exercises a supervision over matters affecting the common weal and enforces the observance by each individual member of society of duties which he owes to others and the community at large. The possession and enjoyment of all rights are subject to this power. Under it, the state may "prescribe regulations promoting the health, peace, morals, education, and good order of the people, and legislate so as to increase the industries of the state, develop its resources and add to its welfare and prosperity." In fine, when reduced to its ultimate and final analysis, the police power is the power to govern.' (*State* v. *Clausen,* 65 Wash. 156, 177 [117 P. 1101, 37 L.R.A. N.S. 466].)

█ "The arbitrary taking of life, liberty, or property cannot, of course, be justified by referring the act to the police power. But, if a given piece of legislation may fairly be regarded as necessary or proper for the protection or furthering of a legitimate public interest, the mere fact that it hampers private action in a matter which had theretofore been free from interference is not a sufficient ground for nullifying the act."

█ This description of the police power by the court had been prefaced by a discourse on the nature and purpose of Workmen's Compensation legislation, the court saying on page 693, 694:

". . . [T]hese statutes, one and all, rest on the underlying notion that the common-law remedy by action, with the requirements of proof incident to that remedy, involves intolerable delay and great economic waste, gives inadequate relief for loss and suffering, operates unequally as between different individuals in like circumstances, and that, whether viewed from the standpoint of the employer or that of the employee, it is inequitable and unsuited to the conditions of modern industry. . . . Without undue expansion of the discussion, it may be said, in a few words, that the theory of this legislation is that the risk of injury to workmen in the industries

governed by the law should be borne by the industries, rather than by the individual workman alone. As the ultimate result, the burden imposed in the first instance upon the employer, will, it is said, be distributed, as part of the cost of production, among the consuming public.''

The United States Supreme Court has upheld the Workmen's Compensation Law of California and of other states as being a valid exercise of the police power. (See, e.g., *Madera Sugar Pine Co.* v. *Industrial Acc. Com.,* 262 U.S. 499 [43 S.Ct. 604, 67 L.Ed. 1091].)

In the years which have followed (and long before the term ''welfare state'' attained common usage) workmen's compensation laws have become so much a part of business and industry (with their benefits by no means unilaterally favoring only the employee) that it now seems odd their enactment as a valid exercise of the police power could ever have been seriously challenged. This does not mean, of course, that workmen's welfare enactments, by bearing that name necessarily fall inside the limits of a legitimate exercise of the police power. Instances where they do not may be noted in cases collected in the digests (see, e.g., 99 C.J.S. 83 et seq.; 58 Am.Jur. 587 et seq.).

 Since the police power has been equated with the ''power to govern'' it has sometimes been too convenient to label all regulatory legislation as acts under the police power, as though once an act was given that magic name the christening instilled the strength to bulldoze away everything lying within its path. Not so. Ours is a government of constitutional limitations; of checks and balances. Our system does not tolerate unrestrained overriding of the rights of individuals in the name of the police power. The Fifth and Fourteenth Amendments are no less inviolable than is the police power when the facts bring the matter within their guaranties. Where the police power is urged as taking a case outside the guaranty of due process a careful weighing and balancing must decide the conflict. Frequently the police power and power of eminent domain will be the colliding doctrines and the function of the courts will be to settle the conflict by careful evaluation of opposing factors to reach a determination as to how the scales tip. Such a problem was before us recently in a case involving an alleged subjection of lands to a servitude of overflow by a state flood control plan. (*Beckley* v. *Reclamation Board,* 205 Cal.App.2d 734 [23 Cal. Rptr. 428].) There we quoted (on p. 750) from Justice

Edmonds' concurring opinion in *Bacich* v. *Board of Control,* 23 Cal.2d 343, 358-359 [144 P.2d 818], where it is said that the court reaches the solution of the problem of whether the legislative act exceeds or stays within the bounds of the police power by weighing " 'the relative interests of the public and the individual, so as to arrive at a just balance in order that government will not be unduly restricted in the proper exercise of its function for the public good, while at the same time giving due effect to the policy . . . insuring the individual against an unreasonable loss occasioned by the exercise of governmental power.' "

In the case at bench counsel for neither party has referred us to any case where in determining the question of constitutionality a court has expressly aligned statutory provisions similar to those here involved to be measured by the tests of police power limitation expressed above; and we have found no such case. In *Colonial Insurance Co., supra,* and in *Globe Indemnity Co., supra,* however, although the opinions do not discuss the question of constitutionality, they do discuss the rule asserted therein from the standpoint of its reasonableness as a matter of state policy. And this being the keystone to a valid exercise of the police power, the value of these cases as authority must be recognized. In *Colonial Insurance Co., supra,* Justice Carter (on p. 82) refers to the rule subjecting one or two of a greater number of successive employers to liability for the entire disability as being "the more workable and fairer rule"; and he adds:

". . . To require an employee disabled with such a disease to fix upon each of the carriers or employers the precise portion of the disability attributable to its contribution to the cause of the malady is not in consonance with the required liberal interpretation and application of the workmen's compensation laws. The successive carriers or employers should properly have the burden of adjusting the share that each should bear and that should be done by them in an independent proceeding between themselves. They are in a better position to produce evidence on the subject and establish the proper apportionment." (That portion of the opinion in *Colonial Insurance Co.* is quoted and adopted by Justice Peek in *Globe Indemnity Co., supra,* at pp. 769, 770.)

The opinion in *Colonial Insurance Co.* does not discuss the possibility that the employer (or insurer) compelled to pay the award might not be able to obtain proportionate contribu-

tion, but that is an ever-present possibility in silicosis claims involving progressive development of the disease over many years. The court therefore should be deemed to have had that possibility in mind in establishing the rule fixing liability for the entire award regardless of the paying employer's ability to enforce proportionate contribution. In doing so it was effectually reasserting the policy previously applied generally to compensation laws in *Western Indemnity Co., supra,* that "the risk of injury to workmen in the industries . . . should be borne by the industries" initially as a cost of production (but with recognition that the cost is passed on to the consuming public ultimately).

True, it is an extension of the policy and one which the Legislature in the original enactment of section 5500.5 considered should receive public assistance through recourse to the Subsequent Injuries Fund. When it removed that recourse in 1959, however, it had before it a report of the Attorney General, made pursuant to a mandate of the 1957 Legislature (Stats. 1957, ch. 2061, p. 3656). This report recommended that use of the Subsequent Injuries Fund for reimbursement *be withdrawn.* The report stated: "[W]e have concluded that the section imposes a financial burden on the taxpayers which properly should be borne by the insurance industry. . . ." (Report to the Legislature Pursuant to Lab. Code, § 4753, by Stanley Mosk, Attorney General, January 1959, p. 24.) It was pointed out that although the 1951 Legislature in the enactment of the section had stated it was giving recourse to the fund because it was inequitable for an employer to pay the total liability for silicosis when other employments contributed to the disability, in practice it was almost always the insurance carrier, not the employer, who seeks to assess the fund, that these insurers were being paid premiums which were based upon a risk that the insurer would be unable to obtain reimbursement from out-of-state or insolvent employers and without any recourse to aid from public funds, and the report states: "Certainly, there is no inequity to require an insurance company to pay what it was paid premiums to insure." (*Idem.,* p. 27.) The report also pointed out that practically all silicosis cases arose as the result of underground gold mining which, as an industry in California, had ceased to exist and this portion of the report concludes: "Section 5500.5 has been and will be used almost exclusively by insurance companies to reimburse them for a liability which resulted from an insurance contract executed

prior to the enactment of section 5500.5."[2] (*Idem.*, pp. 30 and 31.)

The Legislature, apparently accepting this argument, withdrew the use of the Fund for reimbursement. Whether or not this was an act of sound legislative policy is not for us to say. Our inquiry can go no further than to determine whether section 5500.5, after removal of the public reimbursement feature, was within or exceeded the limits of the police power. ▮ We make this determination guided by the restraining principle that a "legislative act is presumed to be constitutional. Unconstitutionality must be clearly shown, and doubts will be resolved in favor of its validity." (3 Witkin, Summary of California Law, p. 1809.) ▮ We face recognition that workmen's welfare has high priority in public interest, that occupational diseases and particularly silicosis with its insidious progression to disability, are matters of grave concern in this field.

The problem with which the Legislature was concerned here has no perfect solution. It is a situation where the entity properly chargeable cannot be reached. Either the injured employee must go uncompensated or someone else must "pick up the tab"—either the public, the industry as a whole, or those solvent members of it who participated in causing the disability. The Legislature has selected the last alternative. We believe it acted reasonably. In the field of torts we lived (more or less uncomfortably) for centuries with a rule of law, the constitutionality of which was never successfully challenged, that there was no right of contribution between persons jointly or severally liable in tort until, in California, the rule was changed by the enactment in 1957 of a Code of Civil Procedure, section 875. Here, where at least an imperfect right of contribution exists, and in a field where a vital matter of public welfare is involved, must a rule of greater circumspection be asserted?

Tested by the foregoing principles we cannot say that the plan of the section as amended in 1959, whereby any selected employer or employers contributing to the disability of the silicosis victim must bear the burden of the entire award with

[2]To the statement in this report we may add our own comment that there seems to be no reported instance of a premium already collected (based upon the greater risk when paid) having been refunded or rebated after the risk had been lessened by the 1951 legislation; and petitioning insurance carrier does not allege any such refund in this case.

only the limited right of reimbursement retained and without recourse to public funds to effect complete reimbursement, is not a valid exercise of the police power—and we so hold.

 In reaching this conclusion we give regard to the fact that the problem is partially quantitative in nature, i.e., validity of an exercise of the police power depends to some extent upon the amount in dollars and cents of the sacrifice an affected citizen must make. Petitioners may not be required (in the language of Justice Traynor)[3] to "contribute more than . . . [their] proper share to the public undertaking." What is the extent of the contribution here? The Legislature, as we have seen, has provided a right in the paying employers to seek contribution from other employers. Also, as a part of the plan, it has gone as far as it can (short of public appropriation) to provide a means of enforcement of the right of contribution. It has foreseen the possibility of insolvency of an employer liable for contribution and has forestalled frustration of contribution on this account by requiring self-insured employers to deposit a bond or securities in an amount fixed by the Director of Industrial Relations (Lab. Code, § 3701) which deposit is available to satisfy claims in the event of insolvency (§ 3704). Thus the problem of reimbursement is narrowed, leaving inaccessible only insolvent insurance carriers and employers beyond the jurisdiction of the commission.

Lava Cap has deposited $25,000 in United States bonds with the State Treasurer which, presently or ultimately, is or will be available to reduce the amount of petitioners' unreimbursable outlay. We were informed (during oral argument) that the commission refuses to release any portion of this fund presently against the possibility that some other former employee may hereafter present a claim not barred by time and that it cannot now be determined how the deposited funds must ultimately be apportioned between possible recipients. We cannot pass upon the validity of this position of the commission in this proceeding—if in fact it takes such position. Certainly the Legislature intended no judgment day delay in accounting, and access to the fund may not be postponed indefinitely. Ultimately contribution of Lava Cap's share will be received by petitioning insurance carrier and should the commission delay apportionment unreasonably (which we will

---

[3]In his concurring opinion in *House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384, 393, at p. 397 [153 P.2d 950, 954].

not assume), said petitioner is not without legal redress.

The award is affirmed.

Schottky, J., and Friedman, J., concurred.

Petitioners' application for a hearing by the Supreme Court was denied October 23, 1963.